1
2
3
4
5
6
7
8
9
10
11
12
13

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

RONALD LENNON,

Petitioner,

v.

DWIGHT NEVEN, et al.,

Respondents.

Case No. 3:10-cv-00663-MMD-VPC

ORDER

14    This represented habeas matter comes before the Court on petitioner's motion
15  for leave to conduct discovery (dkt. no. 35), respondents' motion to dismiss for lack of
16  exhaustion and relation back (dkt. no. 37), and an outstanding motion for an extension
17  (dkt. no. 39).

18  **I.    BACKGROUND**

19    Petitioner Ronald Lennon seeks to set aside his 2006 Nevada state conviction,
20  pursuant to a jury verdict, of one count of first-degree murder of a victim 65 years of age
21  or older and one count of robbery of a victim 65 years of age or older. It appears from
22  the aggregate mandatory minimum sentence structure and petitioner's current age that
23  he faces incarceration into his nineties.[1]

24    In the motion for discovery, petitioner seeks, *inter alia*, to conduct DNA testing of
25  certain evidence that was collected in the investigation but that was not tested by either
26  the State or the defense or was not tested to the extent now sought. All of the discovery

27
_____
28    [1]*See* dkt. no. 13, at 1 (summary of sentence structure). Lennon currently is 60.

1   sought is sought in support of claims of alleged ineffective assistance of trial counsel in
2   Ground 5 of the counseled amended petition.

3       In the motion to dismiss, respondents contend that the claims in Ground 5 of
4   ineffective assistance of counsel are unexhausted and further are untimely for failure to
5   relate back to a timely claim in the original petition. Both defenses are based on the
6   added factual specificity in the amended petition compared to the prior *pro se* state and
7   federal pleadings.

8       In broad brush, the evidence at trial tended to establish, *inter alia*, the following.[2]

9       Ronald Lennon knew the victim, Mary Moore. They were friends who both were
10  "down on their luck," addicted to gambling and each leading largely homeless lives in
11  Las Vegas.

12      Lennon was with Moore for a large part of the day on August 1, 2003, including
13  later in a low-rent motel room in downtown Las Vegas that she rented for a week
14  starting that afternoon. The next day, August 2, 2003, Lennon took a bus apparently to
15  Salt Lake City.

16      A week later, on August 8, 2003, Mary Moore's body was found in the room by
17  motel staff. Investigators observed that her body was in an advanced state of

18
19      [2]The Court defers the preparation of a more complete summary of the trial
    evidence until a later juncture in the case, if and as to the extent then necessary. The
    factual and procedural review herein focuses on: (a) whether petitioner has
20  demonstrated good cause under the applicable habeas rule for the discovery sought;
    and (b) whether the defenses raised in the motion to dismiss should be adjudicated
21  prior to the discovery if it is allowed to proceed. The Court makes no factual findings as
    to the veracity of any assertion of fact by any witness or party at any point in the state
22  proceedings. The Court merely refers to evidence and possible inferences that are
    pertinent to gauging the potential relevance and materiality of the discovery sought.
23      The Court further does not express or intimate any opinion as to the ultimate
    outcome on any other procedural or substantive issue. The Court in particular does not
24  discount or disparage the State's evidence. The prosecution relied extensively at trial
    upon alleged variances in Lennon's statements over time. The State sought to tie the
25  variances and the circumstantial evidence together in context in a manner supporting a
    guilty verdict. *See* dkt. no. 25, Ex. 20, at 4-29 (both opening statements); dkt. no. 27,
26  Ex. 26, at 2-95 (all closing arguments). However, in gauging the potential materiality
    and relevance of the discovery sought, the Court necessarily must focus upon the
27  potential counter-arguments to the State's case. In doing so, the Court does not
    discount or prejudge the relative substantiality of the State's evidence and arguments as
28  they may pertain to other issues in the case.

1  decomposition. Moore had been strangled to death with a number of ligatures – a strap
2  from her purse, a curtain pull cord, and the lace from one of her shoes. The forensic
3  medical evidence could not establish the time of death with any degree of medical
4  certainty. That is, the forensic medical evidence — standing alone — could not establish
5  that Mary Moore was strangled at a time when Lennon necessarily was the person who
6  strangled her.[3]

7        As discussed further below, the evidence that Lennon was the person who
8  strangled Moore, in a low-rent motel room in the middle of downtown Las Vegas,
9  exclusively was circumstantial.

10       Moreover, the evidence did not wholly exclude the possible presence of another
11  individual in the room at the time that Moore was strangled. For example, a washcloth
12  with semen on it was recovered from an indeterminate location that may or may not be
13  under the bed on which Moore's body lay. The semen on the washcloth was not
14  Lennon's semen.[4]

15       The testimony of the crime scene analyst who personally recovered the
16  washcloth was not definitive as to the specific location at which the washcloth was first
17  observed:

18       A. [responding to a question about the actual original location versus the
         photographed location] If we can't see the item, it's very customary – like
19       you saw the contents of the waste basket pulled out. It's very customary
         to move something to show it.
20
         *I don't recall exactly* how these particular photos were taken, but if it's
21       under the – if we said it was under the bed [in the report], it was *probably*
         out of view or *partially* under it [the bed].
22

23  Dkt. no. 26, Ex. 21, at 266 (emphasis added).

24  _____
         [3]The State sought to establish the time of death by circumstantial evidence, such
25  as by inferences from what Moore was wearing and when she was last seen. *See* dkt.
     no. 27, Ex. 26, at 83-85. Be that as it may, the forensic medical evidence did not
26  establish a time of death with any degree of medical certainty. *See* dkt. no. 26, Ex. 21,
     at 211-12 & 214 (medical examiner); *see also id.*, at 64-65, 71-73 & 170-71 (detective
27  acknowledging the point).

         [4]Dkt. no. 26, Ex. 23, at 20, 22, 26, 57-58, 76 (DNA criminalist Thomas Wahl); *id.*,
28  at 135 (defense DNA expert Dr. Norah Rudin, Ph.D)

3

1    The washcloth was found – at the indeterminate location under or partially under
2  the bed – close to three empty Styrofoam cups, a plastic lid for one of the cups, and a
3  napkin. The crime scene analyst suggested a possible connection to items in the trash.
4  He testified that "[t]here was a lid associated with the – the cups under the bed, and the
5  one in the trash, I would – I would – actually there was a lid in the trash." Only one other
6  washcloth was found in the unit, in the bathroom, in addition to the semen-stained
7  washcloth near the bed.[5]

8    The state supreme court's summary of the evidence of petitioner's guilt reflects
9  the degree to which the conviction was based upon circumstantial evidence:

10   In reaching our conclusion [that an error was harmless error], we note that
     the other abundant evidence establishing Lennon's guilt beyond a
11   reasonable doubt, among other things, includes: Lennon having
     possession of the victim's purse after the time of the victim's death; the
12   strap from this purse, among other ligatures, being tied around the victim's
     neck; the victim being known to be protective of her purse to the extent
13   that she would never have given her purse to anyone in order to help her
     find a new one; video footage from the purported day of the victim's death
14   showing the victim having a meal with Lennon and showing the victim
     wearing the same clothes that she was wearing when her body was found;
15   DNA evidence found on the victim's fingernails indicating a partial match
     with Lennon; and the victim's broken fingernail found at the crime scene
16   indicating that a struggle had taken place.

17  Dkt. no. 28, Ex. 36, at 5 n.8.

18   At least in isolation, the items of circumstantial evidence as summarized above
19  did not constitute compelling circumstantial evidence.

20   A person of course can have a meal with another person and not be the person –
21  in a densely populated metropolitan city – who kills them at some uncertain later time.

22   Even if one were to assume that Moore was killed both while Lennon still was in
23  town and while she was wearing the same clothes (rather than possibly after he left but
24  prior to her recovering a change of clothes from a storage unit), that does not establish
25  that Lennon killed her rather than someone else – any more so than their having shared
26  a meal together.

27
       ―――――――――――――
       [5]See dkt. no. 26, Ex. 21, at 116-18 (Detective James Vaccaro); id., at 228-29,
28  238, 245, 248-49 & 288-90 (crime scene analyst Randy McPhail).

4

1        The defense presented an at least not facially implausible explanation, in

2   isolation, for Lennon having the purse, even allowing for the victim's alleged usual

3   propensities regarding a purse. While the State repeatedly focused at trial on how

4   Moore was protective of her purse and its contents, the evidence did not necessarily

5   establish that Moore had a strong emotional attachment to one particular purse itself.

6   Nor did the evidence in truth establish that Lennon had Moore's purse necessarily

7   specifically after the time of her death, which, again, was not established with any

8   certainty by the forensic medical evidence.[6]

9

10        [6]The trial evidence did not necessarily establish that Moore had an emotional attachment to one particular purse as opposed to being protective of its contents. *See* dkt. no. 26, Ex. 21, at 304-07; *id.*, Ex. 22, at 17-18, 59 & 65 (friend and former mission worker Sherie Stephens). Moore tried to present herself well, including by having a presentable purse. *Id.*, Ex. 21, at 304-05; Ex. 22, at 18. She had obtained the purse from a one-day-a-week exchange at the homeless mission. *Id.*, Ex. 22, at 66-67 & 72-75.

        According to Lennon's testimony, the strap on the purse broke; and they were unable to fix it with materials in the room. He was going to sneak into the mission after closing with an old key and get another purse from the exchange room, using the old purse for comparison to find one of the same size. He testified that he got diverted, *inter alia*, gambling and that Moore did not answer when he later went back by the nearby room and knocked. Dkt. no. 27, Ex. 25, at 87-94, 99-105, 135-45, 148-59, 163 & 168-73. *See* also dkt. no. 26, Ex. 22, at 38-40 & 69-72 (Stephens acknowledges a prior incident where Lennon had been staying with Moore but did not return to the room thereafter, leaving Moore to worry about him); *id.*, at 77-78 (Stephens testified that the rooms within the mission, such as the room with items for exchange, were not individually locked).

        Being protective of a purse with all of one's money and identification in it in Las Vegas perhaps would not conclusively establish that an individual would not allow a male friend to take the purse, after the strap allegedly had broken, to go select a replacement at the mission. Mary Moore's friend, Sherie Stephens, testified that she thought that Moore would keep all of her items in the old purse until she had a new one and that she "would think" that Moore would want to select the purse herself. Dkt. no. 26, Ex. 22, at 65-66 & 76-77. That, however, might be argued by a defendant to be a rather slender reed of opinion upon which to ground a murder conviction premised exclusively on circumstantial evidence. Cf. dkt. no. 26, Ex. 22, at 11-12 (Stephens expressed surprise that Moore would have cashed a social security check at a particular time and acknowledged that "she didn't tell me everything"); *id.*, at 44 (expressing that she had been surprised, "shocked, actually," when she learned that Lennon had stayed with Moore the prior time); *id.*, at 62-65 (Stephens had not learned that Moore had lung cancer for several months). Again, the evidence at trial did not necessarily establish that Moore had an emotional attachment to a particular purse, although the State sought to so imply during witness examination and in argument. E.g., *id.*, at 59. Moore would have been parting allegedly with an old purse with a broken strap, which no longer contained her identification. There was no direct evidence that Moore's purse and any remaining currency from her social security check left the room at the same time.

1       Moreover, it would be quite likely that a strangulation would involve a struggle,
2   with possibly a broken nail; and it was not disputed that Mary Moore was strangled. By
3   who instead was the central point at issue, or, more to the point, whether she was
4   strangled by Ronald Lennon.

5       The DNA partial match referred to by the state supreme court was obtained from
6   Mary Moore's fingernails. Significantly, the evidence in question did not consist of
7   apparent skin visible to the naked eye that had been scraped from underneath the
8   victim's fingernails and then subjected to DNA testing. Rather, one fingernail was
9   dropped into a solution that extracted genetic material for testing. Apparent blood on a
10  second fingernail thereafter was swabbed on both sides of the nail and the material on
11  the swab thereafter was subjected to DNA testing. Because the material tested was
12  obtained in this fashion, it could not be determined from the forensic analysis conducted
13  whether the foreign genetic material was on the top of a nail, underneath a nail, or
14  both.[7]

15      The expert forensic testimony reflected that the cells with the foreign genetic
16  material likely were nucleated epithelial cells – cells with a nucleus with DNA – which
17  are found on the skin as well as in other tissues. Such cells constantly are being shed
18  from an individual's skin. Epithelial cells could have been on Moore's nails from casual
19  contact with Lennon or from contact even with cells that had been shed from his skin
20  onto other surfaces. While the State sought to minimize the likelihood of such occurring,
21  experts for both the prosecution and the defense testified that such a transfer
22  mechanism was possible.[8]

23      [7]Dkt. no. 26, Ex. 23, at 25-31, 41-44, 54-56, 64-68 & 89-90 (criminalist Wahl); *id.*,
24  at 102-09 (defense expert Dr. Rudin). The testing from the second nail produced a
    mixed DNA profile, such that the test result did not identify the blood itself on the nail to
25  be from Lennon as opposed to only Moore, with his epithelial cells thus possibly
    accounting for the remaining genetic material in the sample. *See* also dkt. no. 26, Ex.
26  22, at 139-40 (the outside DNA specialist that tested the DNA extract for the State did
    not know whether the genetic material that she tested came from underneath the nail or
27  instead from on top).

    [8]Dkt. no. 26, Ex. 22, at 133-43 (State's outside DNA specialist Gina Pineda); *id.*,
28  Ex. 23, at 48-51, 59-61, 68-69, 76 & 80-81 (criminalist Wahl); *id.*, at 100-02, 106-09, 118
    *(fn. cont...)*

6

1   Lennon undeniably was with Moore for a substantial period of time on August 1,

2   2003, including in the room.  This was not a case where utilizing DNA evidence to prove

3   the presence of someone unknown to the victim supported a strong inference of guilt.

4   Merely having been with Moore would not establish that Lennon murdered her.

5   When witnesses in Las Vegas saw Lennon on the following summer day, August

6   2, 2003, he was not observed to have any scratches or other injuries as might have

7   resulted from a struggle in which it was suggested that Moore may have broken a nail.

8   In sum, it is not difficult to conceive of scenarios that could generate the same

9   items of circumstantial evidence that were summarized by the state supreme court while

10  also being consistent with a circumstance in which another individual killed Mary Moore

11  after Lennon no longer was in the room. This was not a case where the State presented

12  evidence that epithelial and/or other cells from the defendant's hands had been

13  forcefully embedded into the material of the ligatures themselves where the murderer

14  forcibly gripped or tied the ligatures to strangle the victim as she struggled and fought

15  back.[9]

16

17  *(fn. cont…)*

18  & 137-38 (defense expert Dr. Rudin). The outside DNA specialist's testimony tended to focus on direct as to a lesser possibility of getting a full DNA profile based upon casual

19  contact from material recovered from *underneath* a fingernail, with only one reference earlier in a question to "under or on." *Id.*, Ex. 22, at 133-35. She thereafter acceded on

20  cross that she did not know whether the material that she tested came from underneath or instead from on top of a nail. *Id.*, at 140. As noted, the manner in which the material

21  was obtained did not permit a determination of whether the material came from underneath or on top of a nail. The State's recross of the defense expert focused on

22  whether casual contact could leave DNA evidence "under" a nail, notwithstanding that the State's forensic evidence did not establish whether or not the foreign DNA material

23  was recovered from under a nail. *See id.*, Ex. 23, at 138-41. The State's criminalist testified that such casual transfer "would be more likely to occur on the top" of the nail.

24  *Id.*, Ex. 23, at 68.

25  [9]Dkt. no. 26, Ex. 23, at 23-25, 58-59, 63 (criminalist Wahl); *id.*, at 101-02 (defense expert Dr. Rudin). An abrasion on Moore's neck measuring two inches by a

26  half inch was observed during the autopsy, over and above the impressions left by the ligatures after they were removed. The forensic pathologist testified: "A lot of times –

27  whether it's hangings or ligature strangulations, there's sufficient force applied that the – and that the ligature will slip, and when it does that, as it's tightened, it will abrade the

28  skin." Dkt. no. 26, Ex. 21, at 203-04. Such evidence was consistent with force being applied during the strangulation.

7

1   As previously noted, the State sought to tie alleged variances in Lennon's
2   statements together with the circumstantial evidence in context to support a guilty
3   verdict. The Court does not discount or disparage the State's presentation at trial. It
4   merely notes herein counter-arguments to the State's case in assessing the relevance
5   and materiality of the discovery sought on the present motion.

6   On February 13, 2009, following his conviction and direct appeal, Lennon filed a
7   *pro se* state post-conviction petition. On that same date, he filed a motion seeking, *inter*
8   *alia*, an order directing the public defender to deliver to him the entire case file, including
9   without limitation the trial transcripts, appellate briefing, and all other papers and police
10  reports. In the state post-conviction petition, Lennon stated in response to inquiries in
11  the petition form seeking the most basic information – prior case numbers – that he was
12  unable to answer the inquiries because he had been unable to obtain the legal file
13  materials from prior counsel. The claims in the petition were extremely brief. In the
14  "supporting facts" portion of the form for the first two grounds, Lennon stated no factual
15  allegations but instead stated collectively that he had been unable to obtain any of the
16  prior pleadings, transcripts, pretrial and trial materials, and appellate briefing because
17  his prior counsel had not returned his calls or responded to his letters.[10]

18  Two months later, on April 6, 2009, Lennon filed a *pro se* motion requesting a
19  stay of proceedings on the petition pending a ruling on his request for his legal file
20  materials, appointment of post-conviction counsel, and leave to file a supplemental
21  petition after obtaining copies of his legal file materials. Petitioner alleged in particular
22  that he had been unable to adequately prepare his petition without the materials. He
23  sought appointment of counsel both to prepare a counseled supplemental petition as
24  well as to conduct necessary discovery.[11]

25  On April 20, 2009, the day before the hearing on the foregoing motion, the State
26  filed an opposition to the motion. The State opposed the motion on, *inter alia*, the basis

27  [10]Dkt. no. 28, Exhs. 39-40.

28  [11]Dkt. no. 28, Ex. 48.

8

that Lennon had not established an entitlement to transcripts at public expense. The opposition did not address the request that Lennon instead actually had made that he be provided the defense legal files.[12]

On April 21, 2009, the motion was heard without Lennon being present, and the minutes reflect that the motion was denied.[13]

On April 30, 2009, Lennon filed a reply. He noted therein that he had not received the State's response until after the motion had been heard. With regard to the matter of records, Lennon noted that the State appeared to be confused, as he had been seeking his defense files from counsel, not transcripts at public expense. He reiterated his requests for relief in the motion.[14]

On May 1, 2009, the state district court issued a written order submitted by counsel for the State denying the motion in a one-sentence denial without articulated reasons. Lennon's appeal from the denial of the motion was dismissed for lack of jurisdiction.[15]

On June 1, 2009, the state district court ordered that the petition be denied and directed the State to prepare draft findings, conclusions, and order. Thereafter, on September 25, 2009, the state district court issued findings of fact, conclusions of law, and order. The court denied the petition without an evidentiary hearing principally on the basis that Lennon had failed to support the petition with specific factual allegations warranting either an evidentiary hearing or a grant of relief.[16]

On September 29, 2009, Lennon again filed a motion seeking, *inter alia*, an order directing the public defender to provide the entire case file, including without limitation the trial transcripts, appellate briefing, and all other papers and police reports.[17]

---

[12]Dkt. no. 28, Ex. 49.
[13]Dkt. no. 23, Ex. 1, at electronic docketing page 33.
[14]Dkt. no. 28, Ex. 51.
[15]Dkt. no. 28, Exhs. 52-54.
[16]Dkt. no. 23, Ex. 1, at electronic docketing page 35; dkt. no. 28, Ex. 55.
[17]Dkt. no. 28, Ex. 56.

1    The State once again opposed petitioner's request for his defense file on the
2  basis that he was not entitled to transcripts at public expense.[18]

3    The state district court minutes reflect that the court granted the motion on
4  October 13, 2009, directing that Lennon be provided with a copy of the defense file with
5  the trial transcripts included. The record herein does not contain a copy of a
6  corresponding written order. The record further does not reflect that the state district
7  court reopened proceedings on the petition and afforded Lennon an opportunity to
8  present claims with the benefit of the defense file materials, if they actually were
9  provided to him at that time.[19]

10    On December 17, 2009, the state court clerk mailed formal notice of entry of the
11  findings, conclusions and order.[20]

12    On September 10, 2010, the state supreme court affirmed the denial of state
13  post-conviction relief. The court held that Lennon's claims of ineffective assistance of
14  counsel properly had been denied because he failed to support the claims with specific
15  factual allegations. With regard to petitioner's request for his defense case file, the court
16  construed the request as a claim for relief on the petition and held that the claim fell
17  outside the scope of claims permissible in a state post-conviction petition.[21]

18    It thus appears that the *pro se* Lennon went through the entirety of his state post-
19  conviction proceedings without having been afforded an opportunity to allege claims
20  with access to the defense file, despite multiple requests for those materials expressly
21  for that purpose.  A request for the materials was granted in a minute entry only after
22  the petition already had been denied as bare and conclusory, without reopening the
23  proceedings. Petitioner alleged in the *pro se* federal petition that he still had not
24  received the file.

25

26  [18]Dkt. no. 28, Ex. 57.
27  [19]Dkt. no. 23, Ex. 1, at electronic docketing page 36.
    [20]Dkt. no. 29, Ex. 58.
28  [21]Dkt. no. 29, Ex. 64.

10

1    **II.**    **MOTION FOR LEAVE TO CONDUCT DISCOVERY**

2    Rule 6(a) provides that "[a] judge may, for good cause, authorize a party to
3    conduct discovery under the Federal Rules of Civil Procedure . . . ."

4    In *Bracy v. Gramley*, 520 U.S. 899 (1997), the Supreme Court held that Rule 6
5    was meant to be applied consistently with its prior opinion in *Harris v. Nelson*, 394 U.S.
6    286 (1969), which expressly called for the adoption of the rule. 520 U.S. at 904 & 909.
7    In *Harris*, the Supreme Court held that "where specific allegations before the court show
8    reason to believe that the petitioner *may*, if the facts are fully developed, be able to
9    demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the
10    necessary facilities and procedures for an adequate inquiry." 394 U.S. at 300 (emphasis
11    added). In *Bracy*, a unanimous Supreme Court overturned a decision denying discovery
12    where the petitioner's claim of judicial bias in his particular case was based on "only a
13    theory," where the claim was "not supported by any solid evidence" with regard to the
14    theory, and where the Supreme Court expressly noted that "[i]t may well be, as the
15    Court of Appeals predicted, that petitioner will be unable to obtain evidence sufficient to
16    support" the theory that the petitioner sought to pursue in the discovery. 520 U.S. at 908
17    & 909.

18    The Ninth Circuit, consistent with *Bracy* and *Harris*, accordingly has held
19    repeatedly that habeas discovery is appropriate in cases where the discovery sought
20    only might provide support for a claim. *See, e.g., Pham v. Terhune*, 400 F.3d 740, 743
21    (9th Cir. 2005); *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997). *See also Osborne
22    v. District Attorney's Office*, 521 F.3d 1118, 1133 (9th Cir. 2008), *reversed on other
23    grounds*, *District Attorney's Office v. Osborne*, 557 U.S.52 (2009) (in discussing its
24    precedent in *Jones* as to habeas discovery, the Ninth Circuit reinforced the point that a
25    court should allow discovery that, as emphasized by the Court of Appeals, only *"may*
26    establish" a factual basis for the petitioner's claim).

27    Petitioner seeks a number of materials directed primarily to forensic evidence in
28    connection with claims in Ground 5 that he was denied effective assistance of trial

1 counsel when counsel failed to adequately investigate the case. He has presented
2 extensive argument as to the reasons for the specific discovery requests in relation to
3 the trial evidence and the claims presented herein.[22] Against the backdrop of the Court's
4 partial summary of the trial evidence, *supra*, the Court finds that petitioner has
5 presented specific allegations that show reason to believe that, if the facts are fully
6 developed, petitioner possibly may be able to demonstrate that he is entitled to relief. In
7 a case based upon circumstantial evidence as extensively as the present case, forensic
8 testing of, *e.g.*, the multiple ligatures that were used to strangle Mary Moore that was
9 not conducted to that extent prior to trial not implausibly could provide evidence
10 supporting petitioner's habeas claims.

11 Respondents provide no specific argument to the contrary directed to the actual
12 trial evidence and the particular discovery sought.

13 Respondents contend, relying upon *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011),
14 that "[f]ederal habeas proceedings are not alternative forums for developing claims that
15 a petitioner made an insufficient effort to pursue in the state courts."[23]

16 Given the procedural history outlined previously, the Court hardly is persuaded
17 that petitioner made an insufficient effort to pursue his claims in the state courts.
18 Rather, he was not allowed even to have the defense file to review in preparing claims
19 before his state post-conviction petition was denied as bare and conclusory. Nothing in
20 *Pinholster* suggests that a petitioner given such cursory handling – much less one
21 convicted of first-degree murder and facing essentially incarceration for life – should be
22 barred from seeking discovery in federal court on the premise that he made an
23 insufficient effort to pursue his claims in state court.[24]

24

25

26

27

28

---

[22]*See* dkt. no. 35, at 7-17.

[23]Dkt. no. 38, at 3.

[24]Lennon requested not only access to the defense file but also appointment of counsel to assist him in seeking discovery to support the state petition.

The Court declined to decide in *Pinholster* "whether § 2254(e)(2) prohibited the District Court from holding the evidentiary hearing or whether a district court may ever choose to hold an evidentiary hearing before it determines that § 2254(d) has been
*(fn. cont...)*

12

1        In much the same vein, respondents contend that the discovery should be denied
2  because: (a) petitioner "provides no explanation for his failure to make any effort to
3  obtain the requested records in his state post-conviction proceeding;" and (b) petitioner
4  "does not explain why [he] made no attempt to obtain the records in his state habeas
5  proceeding or why this Court should allow him to seek discovery now on his
6  unexhausted claims."[25] The procedural history discussed above provides the
7  explanation that respondents seek with regard to any failure to make yet even further
8  requests for relief in the state courts. Petitioner otherwise has satisfied the requirements
9  of Rule 6(a), which requires no additional explanation of why discovery should be
10  allowed on allegedly unexhausted claims.

11        Finally, respondents contend that the discovery is premature and that the Court
12  should not consider the discovery request until after adjudicating their motion to dismiss.
13  The Court finds that the interests of justice would be better served in this case by doing
14  the contrary.

15        The defenses relied upon by respondents in the motion to dismiss have a direct
16  relationship to the manner in which Lennon's state petition was adjudicated in the state
17  courts. Respondents contend that the ineffective-assistance claims in the counseled
18  amended petition are unexhausted because they allege extensive factual particulars
19  that were not included in petitioner's claims in the state courts – where he did not have
20  even the defense file. Respondents contend that the counseled amended claims further

22  *(fn. cont…)*
23  satisfied." 131 S.Ct. at 1411 n.20. *A fortiori*, the Supreme Court made no holding in
*Pinholster* as to whether a district court may grant leave for discovery before it
24  determines whether § 2254(d)(1) has been satisfied on the merits. Most certainly, the
Supreme Court made no holding in *Pinholster* that a petitioner seeking leave for
25  discovery under Rule 6(a) must anticipatorily demonstrate – over and above what the
apposite Supreme Court authority in *Bracy* requires – that the discovery sought would
26  not place his claims in alleged conflict with *Pinholster*. *Cf. Gonzalez v. Wong*, 667 F.3d
965, 978-80 (9th Cir. 2011) (remanding for entry of a stay for state court consideration of
27  evidence obtained in federal habeas discovery, to permit consideration of the evidence
by the state courts in light of *Pinholster*).

28      [25]Dkt. no. 38, at 3 & 4.

1  are not timely because they do not relate back to the timely but similarly undetailed
2  claims in the *pro se* original federal petition.

3       The Court is not persuaded on the arguments made on the motion to dismiss that
4  the claims so clearly are unexhausted and/or untimely that those issues should be
5  definitively resolved prior to allowance of the discovery.

6       With regard to exhaustion, petitioner argues not without some force that any
7  absence of exhaustion of the claims should be excused under 28 U.S.C. §
8  2254(b)(1)(B)(ii) because circumstances existed that rendered the state court corrective
9  process ineffective to protect the rights of the petitioner. While the Court makes no
10  definitive holding at this time, petitioner quite arguably was allowed the facility to do little
11  more than file a paper titled as a petition.  Even someone versed in the law would have
12  had considerable difficulty framing a meaningful petition without access to the defense
13  file.

14       Respondents deny that the first proceeding was deficient, but they suggest that
15  state corrective process nonetheless would not be ineffective because petitioner can
16  seek a stay to return to the state courts to exhaust the allegedly unexhausted more
17  specific claims.[26] The Court is not necessarily sanguine that a petitioner allowed such
18  little facility to present the claims the first time must be remitted back to the state courts
19  for a second time to pursue the claims. In any event, the Court will take respondents'
20  argument into account should a stay be requested herein, which petitioner has not
21  sought and need not necessarily seek.

22       Meanwhile, the discovery sought in this matter will proceed forward.  Over and
23  above the relevance of the discovery to the substantive claims, the evidence developed
24  further may inform the Court's decision on procedural issues that have arisen or that
25  potentially soon may arise.  Over and above the exhaustion issue, the discovery sought
26  also may have a bearing on a determination of whether petitioner can establish: (a) a

27
28       [26]Dkt. no. 42, at 2-3.  Petitioner currently is litigating a parallel petition in the state
    courts through federal habeas counsel.

1    basis for delayed accrual, statutory tolling and/or equitable tolling of the federal
2    limitation period based upon petitioner's inability to secure even the most basic
3    materials needed to meaningfully present the claims previously;[27] and/or (b) cause and
4    prejudice to overcome any procedural default of the claims in the pending second state
5    post-conviction proceedings.  As the matter stands now, the Supreme Court's decision
6    in *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), already provides a basis for a finding of at
7    least cause to overcome any procedural default as to claims in Ground 5 given that,
8    *inter alia*, counsel was not appointed in the initial collateral review proceeding. The
9    discovery may have pertinence to whether he also may be able to demonstrate
10   prejudice.[28]

11   **III.    CONCLUSION**

12           It is therefore ordered that petitioner's motion for leave to conduct discovery (dkt.
13   no. 35) is granted, such that the Court grants petitioner leave to pursue the discovery
14   outlined at pages 16-17 of the motion, through such interrogatories, requests for
15   production, and/or subpoenas duces tecum as are necessary to obtain the discovery
16   sought, without the necessity of prior Court approval of the particular discovery
17   instruments served to obtain the discovery approved by this order. This order authorizes
18   subpoenas duces tecum and/or other necessary instruments to, *inter alia*, the Las
19   Vegas Metropolitan Police Department, Las Vegas Fire and Rescue, and American
20   Medical Response to obtain the discovery sought.

21           It is further ordered that the certification requirements of Rules 26(c)(1) and
22   37(a)(1) of the Federal Rules of Civil Procedure and Local Rule LR 26-7 apply to any
23   and all disputes with regard to the discovery allowed herein.  The parties and any non-
24   parties served shall confer and endeavor in good faith to resolve any and all discovery

25           [27]*Cf.* 28 U.S.C. § 2244(d)(1)(D)("The limitation period shall run from the latest of
26   – . . . the date on which the factual predicate of the claim or claims presented could
     have been discovered through the exercise of due diligence.").

27           [28]To the extent that respondents note what petitioner has or has not argued on
     the present motions, the Court's concern is to do substantial justice on the record
28   presented.

1 | disputes in this regard, and they shall seek court intervention only as a last resort. All
2 | applicable discovery sanction provisions of Rules 26 through 37 further shall apply.

3 |      It is further ordered that petitioner shall have one hundred (120) days from entry
4 | of this order to complete the discovery authorized by this order.

5 |      It is further ordered that petitioner shall have one hundred fifty (150) days from
6 | entry of this order to file, along with any requests for other appropriate relief, either: (a)
7 | an amended petition taking into account the facts developed in the discovery; or (b) a
8 | notice that petitioner will not be seeking to amend the petition at that juncture.

9 |      It is further ordered that respondents' motion to dismiss (dkt. no. 37) is denied
10 | without prejudice.

11 |      It is further ordered that respondents shall have thirty (30) days from service of
12 | the amended petition or notice filed by petitioner to respond to the pleadings as
13 | amended as of that juncture. The Court's prior order barring the serial presentation of
14 | defenses (dkt. no. 32) shall not preclude respondents from raising any and all
15 | procedural defenses then applicable to the petition as then amended. However, the
16 | provisions at page 1, lines 24-28, and page 2, lines 1-10, of dkt. no. 32, continue to
17 | apply fully to any response filed to the petition as then amended. Accordingly, *inter alia*,
18 | respondents shall present any and all procedural defenses to be raised to the amended
19 | petition only in a single consolidated motion to dismiss, pursuant to the particular
20 | requirements specified in the prior order.

21 |      It is further ordered that petitioner shall have thirty (30) days from service of the
22 | response to the amended petition to file an opposition to a motion to dismiss or a reply
23 | to an answer.

24 |      It is further ordered that petitioner's motion for an extension of time (dkt. no. 39)
25 | is granted *nunc pro tunc* in connection with the response (dkt. no. 41) filed.

26 | ///
27 | ///
28 | ///

16

1         It is further ordered that — for any additional state court record or other exhibits

2   filed subsequently in this matter — counsel shall send the hard copies of the exhibits to

3   the Reno Clerk's Office.

4

5         DATED THIS 25th day of March 2014.

6

7                                MIRANDA M. DU

8                                UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17